**FILED** ᛁ₅

AUG 2 8 2015

AUG 28 2015

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

AO 91 (Rev. 11/11) Criminal Complaint

AUSA Kartik Kautaa (2015) 469-6026

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

UNITED STATES OF AMERICA

v.

CHRISTOPHER C. HICKSON

CASE NUMBER: **15 CR 529**
UNDER SEAL

MAGISTRATE JUDGE GILBERT

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about November 3, 2014, at Aurora, in the Northern District of Illinois, Eastern Division, and elsewhere, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code, Section 841(a)(1) | knowingly and intentionally possessing with intent to distribute a controlled substance, namely, a quantity of anabolic steroids, a Schedule III controlled substance, in violation of Title 21, United States Code, Section 841(a)(1). |

This criminal complaint is based upon these facts:

  X  Continued on the attached sheet.

_____
DANIEL NUGENT
Special Agent
Homeland Security Investigations (HSI)

Sworn to before me and signed in my presence.

Date: August 28, 2015

_____
Judge's signature

City and state: Chicago, Illinois

JEFFREY T. GILBERT, U.S. Magistrate Judge
*Printed name and Title*

UNITED STATES DISTRICT COURT      )
                                         )

NORTHERN DISTRICT OF ILLINOIS     )

## AFFIDAVIT

I, DANIEL NUGENT, being duly sworn, state as follows:

1.      I am a Special Agent with the United States Department of Homeland Security, Homeland Security Investigations ("HSI"), and have been so employed for approximately six years.  Prior to my employment with HSI, I served as a United States Customs and Border Protection Officer from approximately 2003 through 2008.

2.      I am currently assigned to the HSI O'Hare International Airport office and conduct investigations relating to violations of federal narcotics laws, including Title 21, United States Code, §§ 841, 843, 846 and 952, and federal money laundering offenses, including Title 18, United States Code, § 1956(a)(2)(A).  In conducting these investigations, I have employed a variety of investigative techniques and resources, including, but not limited to, physical surveillance, the questioning of witnesses and informants, undercover operations, pen registers and trap and trace devices, vehicle tracking devices, search warrants, and the use of court-authorized interception of wire and electronic communications.  Through these investigations, the use of the above-described techniques, my training and experience, and conversations with other law enforcement personnel, I have become familiar with methods drug traffickers use to safeguard narcotics, to distribute narcotics, and to collect and launder narcotics-related proceeds.

3.      This affidavit is submitted for the limited purpose of establishing probable cause that Christopher C. HICKSON did knowingly and intentionally possess with intent to distribute a controlled substance, namely, a quantity of anabolic steroids, a Schedule III controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).  The information in this affidavit is based on: my personal knowledge; a November 3, 2014, interview

1

of HICKSON; a November 3, 2014, search of HICKSON's residence pursuant to a state search warrant; a trash pull at the residence; interviews of witnesses; financial information received pursuant to administrative subpoenas; emails obtained pursuant to federal search warrants for email accounts used by HICKSON; information received from other law enforcement personnel; my experience and training; and the experience of other law enforcement agents. Because this affidavit is being submitted for the limited purpose of securing this criminal complaint, I have not included every fact known to me about this investigation.

## FACTS ESTABLISHING PROBABLE CAUSE

### A.     Information from a Confidential Informant

1.     Since approximately October 2014, the Drug Enforcement Administration ("DEA") and other law enforcement agents across the country have been conducting an investigation into the illegal importation and distribution of anabolic steroids being smuggled into the United States from other countries, including China, in violation of Title 21, United States Code, Sections 841, 843, 846, and 952.[1] During the investigation, investigators conducted a controlled delivery of a parcel containing anabolic steroids that are Schedule III controlled substances to an individual living in Northwest Indiana ("CI-1"). After CI-1 was confronted about the parcel, CI-1 began cooperating with law enforcement and provided information concerning a steroid smuggling and distribution conspiracy operating in multiple countries around the world.[2]

---

[1] Anabolic steroids are a family of compounds that includes *testosterone* and synthetic compounds structurally related to *testosterone*. Anabolic steroids are Schedule III controlled substances. *See, e.g.,* http://www.deadiversion.usdoj.gov/pubs/brochures/steroids/ public/

[2] CI-1 has no criminal history. The CI-1's information has proven reliable and credible, and has been corroborated by independent investigation that thus far includes physical surveillance conducted by law enforcement officers; a November 3, 2014, trash pull at HICKSON's home; a November 3, 2014, search executed at HICKSON's home; the review of

2.     On or about October 23, 2014, I received the following information from HSI and

DEA Indiana concerning CI-1's cooperation. Among other things, CI-1 admitted that he/she

obtained the raw materials used to manufacture steroids from a supplier living outside the United

States.[3] CI-1 also reported that he/she, in turn, had made arrangements to deliver the raw

materials to an associate, Christopher HICKSON, in order to enable HICKSON to manufacture

anabolic steroids for distribution to others. Specifically, after receiving a shipment of raw

materials in August 2014 via the mail, CI-1 admitted that he/she delivered the raw materials to

HICKSON's home located in Aurora, Illinois, on August 31, 2014.[4] According to CI-1, when

CI-1 went to HICKSON's home on August 31, 2014, he/she saw a large steroid laboratory inside

that contained unknown powders, steroids, and shipping materials. CI-1 also reported that

HICKSON was in possession of a pill pressing machine. Moreover, according to CI-1, after

he/she had brought bulk steroid powder to HICKSON in the past, HICKSON would use the pill

press to turn the powder into steroid pills. Upon pressing the powder into steroid pills, CI-1

would then collect the pills from HICKSON and distribute the pills to consumers.

**B.     Customs and Border Protection Records**

3.     On or about October 23, 2014, I performed queries in a law enforcement database

concerning HICKSON. According to records maintained by United States Customs and Border

Protection ("CBP"), on or about October 18, 2013, CBP officers conducted a routine border

inspection of a parcel mailed from China to "Chris HICKSON" to the aforementioned residence

---

emails and text messages sent and received by HICKSON; and interviews of witnesses who have
assisted HICKSON in narcotics trafficking activities.

[3] CI-1 reported obtaining the following Schedule III controlled substances from his/her
supplier: *Tren Acetate*, *Testosterone Enanthate*, *Testosterone Proprionate*, *Winstrol*, *Dianabol*
*(Methandrostenolone)*, and *Testosterone Sustanon*.

[4] As discussed below, after confirming that HICKSON lived at the residence, HSI
executed a state search warrant at that home on or about November 3, 2014.

3

in Aurora, Illinois. During the inspection and resulting border search of the parcel, CBP officers located a large quantity of an unknown white powder. CBP officers detained the shipment and sent a sample of the unknown powder to the CBP forensic laboratory in Chicago. According to laboratory reports, the unknown powder tested positive for *Stanozolol*, a steroid that is a Schedule III controlled substance. CBP officers seized approximately 436 grams of *Stanozolol* powder from the parcel. Through my training and experience, I know that 436 grams of *Stanozolol* powder generally represents a quantity of bulk steroid powder that is intended for use in the manufacturing and distribution of *Stanozolol*.

4.      It is the common practice of CBP Officers to forward a "notice of removal" to the intended recipient anytime a seizure of controlled substances is made from a mail parcel. It is also the common practice of the CBP Fines, Penalties and Forfeiture Office to send a formal notice to the importer within 60 days of the seizure that a seizure of property had occurred. According to CBP records, a seizure notice was sent to HICKSON in 2013.

### C.      The Trash Pull at HICKSON's Home

5.      On or about October 23, 2014, law enforcement queried an Illinois Secretary of State database and determined that HICKSON's home address was the same address where the parcel containing *Stanozolol* powder was mailed from China to "Chris Hickson." Moreover, on or about October 23, 2014, I conducted open source reporting queries and confirmed that HICKSON was associated with the address where the parcel had been mailed.

6.      On or about November 3, 2014, I conducted surveillance at the same address and observed a 2015 pickup truck registered to HICKSON parked in the driveway.

7.      On or about November 3, 2014, I made arrangements with the trash collection company responsible for trash removal from that address to have the trash collected from the

address and presented to law enforcement for inspection. Later that day, law enforcement agents met with a garbage truck driver responsible for collection the address and arranged for a trash pull. Agents subsequently saw the driver remove the contents of the trash can and two recycling bins from the curb in front of the property and place the contents in an empty hopper that was affixed to the front of the garbage truck. Law enforcement maintained constant surveillance of the garbage truck after it departed the address and traveled approximately two blocks away. At that time, I removed six white trash bags from the hopper of the garbage truck. All six bags were knotted shut and did not contain rips. The bags were thereafter opened and inspected.

8. During this trash pull, I inspected one bag that, based on my training and experience, contained numerous items consistent with steroid manufacturing, distribution, and use. For example, in that bag, I located eight glass jars each containing a yellow, oil-like substance. Each jar was labeled with names that, based on my training and experience, were consistent with various brands of anabolic steroids that are Schedule III controlled substances. In the same bag, I also located a number of syringes and needles that appeared to have a yellowish colored liquid in them. Moreover, in the same bag, I also located numerous pieces of paper that listed names, addresses, brands of steroids, and quantities of steroids.

9. Additionally, in the same bag of trash, I located an empty express mail box originating from China addressed to "Chris HICKSON" at the suspect address. According to the United States Postal Service website, this parcel had been delivered on or about October 30, 2014, and had been signed for by a "C HICKSON."

10.     Furthermore, in the same bag of trash, I also located a piece of paper that appeared to be an email sent to the email address "hickson963@safe-mail.net."[5] The email listed a number of different anabolic steroids, many of which were Schedule III controlled substances. The same bag of trash also contained a bank statement addressed to HICKSON at the address.

**D.      Western Union Records for HICKSON's Overseas Wire Transfers**

11.     On or about October 29, 2014, pursuant to an administrative subpoena, I received records from Western Union showing that HICKSON had wired approximately $22,760 to China between approximately April 2013 and June 2014.  According to documents produced by Western Union, HICKSON listed his home address and home phone number on all of the wire transfers.  The Western Union documents also reflect that HICKSON had wired an additional $1,805 to different individuals located in Thailand, the Czech Republic, Cameroon, and Turkey. Furthermore, according to the Western Union documents, HICKSON had also collected approximately $4,965 since May 2014 from at least 15 different individuals located across the United States and Canada.

**E.      The Search of HICKSON's Home and Recovery of Anabolic Steroids**

12.     On or about November 3, 2014, law enforcement officers received a state search warrant from the Circuit Court of Kane County, Illinois, authorizing the search of HICKSON's residence in Aurora.  Later that day, law enforcement executed the search warrant.  Before breaching the front door of the home, agents knocked and announced their office.  Through the glass door, I observed an individual, later identified as HICKSON, run away from the front door

---

[5] Safe-Mail is an Israeli-based encrypted email service provider that bills itself as "a highly secure communication, storage, sharing and distribution system for the Internet… [that] provides email, instant messaging, data distribution, data storage and file sharing tools in a suite of applications that enable businesses and individuals to communicate and store data with privacy and confidence."  *See, e.g.*, http://www.forbes.com/sites/runasandvik/2014/01/31/the-email-service-the-dark-web-is-actually-using/

6

and attempt to evade law enforcement. Law enforcement breached the front door and made entry into the home. According to officers stationed on the side of the home, HICKSON had attempted to exit the residence through the side door, but was detained.

13.     The search of the residence resulted in the recovery and seizure of a large electronic pill press weighing over 200 lbs., over 1,000 vials of suspected steroids, hundreds of suspected steroid pills and capsules, approximately $4,841 in cash, shipping boxes, shipping labels, empty glass vials, empty capsules, and over 10 kilograms of suspected bulk anabolic steroid powder. Law enforcement also recovered a number of United States Postal Service shipping boxes filled with vials labeled as anabolic steroids that, based on their names, appeared to be Schedule III controlled substances. The mail parcels were addressed to individuals located throughout the United States.

14.     On or about November 6, 2014, I submitted for laboratory testing a sample of approximately 1008.16 grams of a powdery substance that was seized from HICKSON's home. The CBP laboratory subsequently confirmed that the substance had tested positive for an anabolic steroid, *Testosterone Enanthate*, a Schedule III controlled substance.

15.     On or about November 6, 2014, I submitted for laboratory testing a sample of approximately 1015.81 grams of a powdery brick-like substance that was seized from HICKSON's home. The CBP laboratory subsequently confirmed that the substance had tested positive for an anabolic steroid, *Nandrolone Decanoate*, a Schedule III controlled substance.

16.     On or about November 6, 2014, I submitted for laboratory testing a sample of approximately 512.86 grams of a white powder that was seized from HICKON's home. The CBP laboratory subsequently confirmed that the substance had tested positive for an anabolic steroid, *Nandrolone Phenylpropionate*, a Schedule III controlled substance.

17. On or about November 6, 2014, I submitted for laboratory testing a sample of approximately 1016.35 grams of a white powdery substance that was seized from HICKSON's home. The CBP laboratory subsequently confirmed that the substance had tested positive for an anabolic steroid, *Testosterone 17b Cypionate*, a Schedule III controlled substance.

### F. HICKSON Admits to Importing, Manufacturing, and Distributing Anabolic Steroids

18. On or about November 3, 2014, I interviewed HICKSON at his home after he received and waived his *Miranda* rights orally and in writing. During the interview, HICKSON admitted to the following, among other things. HICKSON admitted that he had been importing, manufacturing, and distributing anabolic steroids for approximately 15 months. HICKSON admitted that he had collected approximately $100,000 as payment for the steroids that he sold. HICKSON stated that he knew what he was doing was illegal. HICKSON also acknowledged that all of the steroids in the home belonged to him, and he estimated he had approximately $60,000 worth of steroids inside the home. HICKSON further stated that he had utilized the United States Postal Service to ship steroids throughout the United States. HICKSON also admitted that he had wired thousands of dollars overseas to China to pay for the bulk steroid powder that he was smuggling into the United States from China. HICKSON acknowledged that he was manufacturing and labeling anabolic steroids under his own brand names, including "True Labs," "Rift Labs," and "PureGear Labs."

### G. HICKSON's Use of Email Accounts to Purchase and Distribute Bulk Steroid Powder

19. Additionally, during his interview, HICKSON admitted that he had utilized a specific AOL email address in furtherance of his drug trafficking activities. HICKSON stated that he had utilized this account to correspond with overseas suppliers of bulk steroid powders,

as well as to distribute steroids to numerous individuals located throughout the United States. I subsequently sought and obtained a federal search warrant for HICKSON's AOL account.

20.     During the search of HICKSON's residence, law enforcement officers also located a Western Union receipt showing that HICKSON had wired approximately $2,050 to an individual located in Wuhan City, China. The receipt indicated that HICKSON gave a Gmail email address to Western Union in the "your information" block of the Western Union wire slip.

21.     During his interview, HICKSON provided me with written consent to search his laptop computer, which was observed inside the home when the search warrant was executed, and which was turned on with the screen visible. While briefly searching the contents of the laptop, I located an opened internet tab on the desktop. The tab was opened to the inbox of the same Gmail account as the one listed on the Western Union receipt. During a brief search of this account, I saw a number of emails that were both sent from HICKSON, and received by HICKSON. These emails pertained to the sale and distribution of anabolic steroids, and in some instances, the recipients and/or senders were utilizing Safe-Mail to communicate with HICKSON.[6] I subsequently obtained a federal search warrant for HICKSON's Gmail account.

### H.     Interviews of HICKSON's Co-Conspirators

22.     During his interview, HICKSON also provided me with written consent to search his cell phone and text messages. I subsequently searched the text messages and determined that HICKSON had been texting several associates to discuss the manufacture and distribution of anabolic steroids. After using open source reporting to determine the identities of the associates that HICKSON had been texting, I conducted interviews of those associates.

---

[6] As described above, during the November 3, 2014, trash pull, I recovered a piece of paper that appeared to be an email sent to the email address "hickson963@safe-mail.net."

9

23.     On or about December 10, 2014, I interviewed Individual A, one of the associates that HICKSON had texted to discuss the manufacturing and distribution of anabolic steroids. Individual A stated that he/she had known HICKSON for a number of years. Individual A stated that he/she had been to HICKSON's residence on numerous occasions. Individual A stated that he/she had observed large quantities of steroids throughout HICKSON's residence in the past. Individual A stated that HICKSON kept steroids in his bedroom, in a lab room in the upstairs area of the residence, in the kitchen, and in his vehicle. Individual A stated that he/she also had observed a pill press in HICKSON's home. Individual A estimated that HICKSON made between $80,000 and $90,000 per year selling steroids. At one point, according to Individual A, HICKSON told Individual A that he wanted to keep selling steroids until he had enough money to retire. Individual A also admitted to assisting HICKSON in filling empty capsules with steroid powder, in exchange for payment. Individual further stated that HICKSON called him/her the night that the above-described search warrant was executed at HICKSON's home, and requested Individual A to liquidate a bank account, which Individual A said contained approximately $5,000. According to Individual A, HICKSON was concerned that the police were going to seize the money from his checking and savings accounts. Individual A said that he/she refused to assist HICKSON in this manner. According to Individual A, HICKSON later said that HICKSON's mother had withdrawn all the money and "taken care of it."

24.     On or about December 11, 2014, I interviewed Individual B, another associate that HICKSON had texted to discuss the manufacturing and distribution of anabolic steroids. Individual B stated that he/she had purchased steroids from HICKSON in the past, and that HICKSON was a known distributor of steroids. Individual B stated that approximately two or three months earlier, HICKSON offered Individual B the opportunity to make $20 per hour.

Individual B claimed to not know what the work entailed, but agreed to do it. Individual B reported that he/she thereafter went to HICKSON's home in Aurora, the location where the above-described search warrant was executed. At that time, according to Individual B, HICKSON had Individual B sit in HICKSON's dining room and provided Individual B with a number of plastic containers containing different powders, as well as a number of empty capsules. HICKSON instructed Individual B to fill the capsules with powder and then place the filled capsules in a green pill bottle. Individual B acknowledged that he/she knew that he/she was filling the capsules with steroid powder. Individual B further reported that, on a second occasion when Individual B was filling capsules for HICKSON, HICKSON instructed Individual B to wire approximately $2,500 of HICKSON's money to China, in exchange for a fee. HICKSON also told Individual B that the money was to be used to invest in shoes. After Individual B wired out the money for HICKSON, Individual A said HICKSON immediately acknowledged that the money was payment for "making steroids." According to Individual B, HICKSON told Individual B that HICKSON was banned from wiring any money from the United States.

25. On or about December 11, 2014, I interviewed Individual C, another associate that HICKSON had texted to discuss the manufacturing and distribution of anabolic steroids. Individual C was, at the time of the interview legally an adult, but was still a high school student. Individual C reported that he/she met HICKSON approximately two years before at a gym in Aurora. Individual C described HICKSON as a "personal friend" and "personal trainer." Individual C stated that approximately two months earlier, HICKSON approached him/her and asked if he/she would be willing to help HICKSON fill capsules with powder. Individual C agreed to help fill the capsules, and in exchange, HICKSON agreed to give him/her personal

11

training sessions. Individual C stated that he/she then filled capsules on three separate occasions at HICKSON's home in Aurora during a one-week time period. Each time, Individual C approximated that he/she spent about four hours per day filling capsules in HICKSON's dining room. Individual C estimated that he/she filled approximately 100 capsules during a four hour period. Individual C stated that on one occasion, Individual B was also present at HICKSON's residence and was also filling capsules. Individual C stated that he/she thought that he/she was filling the capsules with pre-workout supplements. However, Individual C recalled that while filling capsules, he/she observed two large plastic bags containing large quantities of glass vials labeled as *testosterone*, which Individual C knew was an anabolic steroid. Individual C also stated that HICKSON had asked him/her to wire money on HICKSON's behalf, but Individual C refused because it "sounded weird." Individual C further admitted that he/she accompanied HICKSON in HICKSON's vehicle on two separate occasions when HICKSON had sold steroids to customers. Individual C stated that HICKSON had also asked Individual C to find customers who would be willing to purchase steroids from HICKSON.

26.    On or about December 19, 2014, I interviewed Individual D, another associate that HICKSON had texted to discuss the manufacturing and distribution of anabolic steroids. According to Individual D, during the summer of 2014, a mutual friend approached him/her and inquired about purchasing steroids. Knowing that HICKSON was a known steroid distributor, Individual D stated that he/she then acted as a "middleman" between the mutual friend and HICKSON. Individual D stated that others thereafter began to ask Individual D about purchasing steroids from HICKSON. Individual D admitted to directing people to HICKSON so that they could purchase steroids. Individual D admitted that, as time went on, he/she became more engaged in the steroid distribution conspiracy with HICKSON. Among other things,

12

Individual D stated that he/she began to coordinate for HICKSON shipments to people located throughout the United States. Individual D stated that he/she would inform potential customers as to what types of steroids HICKSON had on hand, and once a customer knew what they wanted, Individual D would put them in direct contact with HICKSON. The customers would then transfer funds directly to HICKSON, and HICKSON would send the steroids to them. Individual D admitted to being a "middleman" for approximately ten shipments of steroids sent by HICKSON during a four or five month period. Individual D also admitted that HICKSON asked Individual D on a number of occasions if Individual D would be willing to go to Western Union to pick up and send money for HICKSON. Individual D recounted that, on one occasion, HICKSON also offered to purchase Individual D a fake identification document so that Individual D would not have to use Individual D's true identity to conduct illicit financial transactions. Individual D said that he/she refused HICKSON's offer.

<strong>CONCLUSION</strong>

27.     Based on the foregoing, I respectfully submit that there is probable cause to believe that Christopher C. HICKSON committed the crime charged in the criminal complaint.

FURTHER AFFIANT SAYETH NOT.

Daniel B. Nugent
Special Agent
Homeland Security Investigations

Subscribed and sworn to before me
on this 28th day of August, 2015.

Honorable Jeffrey T. Gilbert
United States Magistrate Judge

13