UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | No. 15 CR 529-1 |
| | ) | |
| CHRISTOPHER C. HICKSON | ) | Judge Wood |

**GOVERNMENT'S POSITION PAPER AS TO SENTENCING FACTORS**

The UNITED STATES OF AMERICA, by its attorney, JOEL R. LEVIN, Acting United States Attorney for the Northern District of Illinois, respectfully recommends that the Court sentence defendant Christopher C. Hickson to a sentence within the applicable advisory Sentencing Guidelines range.

**I.      The Presentence Investigation Report's Factual Recital is Correct.**

Defendant Hickson was charged with the offenses in the indictment after he was found to be operating a large-scale steroid laboratory from his home in Aurora, Illinois. After being indicted on several drug and money laundering offenses, he pleaded guilty to Counts 1 and 3 of the indictment, which charged him respectively with drug conspiracy, 21 U.S.C. § 846 and § 2, and money laundering, 18 U.S.C. § 1956(a)(2)(A). The PSR correctly states the facts concerning defendant's offenses. PSR, ¶¶13-23. The facts are also set forth in more detail in the Government's Amended Version of the Offense.

*Background*

After a confidential informant was confronted by Homeland Security Investigations ("HSI") agents during a controlled delivery of a parcel containing anabolic steroids, the CI admitted that he/she obtained the raw materials used to manufacture anabolic steroids from a supplier living outside the United States. The CI also reported that he/she, in turn, had made

arrangements to deliver the raw materials to Hickson, in order to enable Hickson to manufacture anabolic steroids for distribution to others. Specifically, after receiving a shipment of raw materials in August 2014 via the mail, the CI admitted that he/she delivered the raw materials to Hickson's home in Aurora, Illinois, on August 31, 2014. According to the CI, when the CI went to Hickson's home, he/she saw a large steroid laboratory inside that contained unknown powders, steroids, and shipping materials. The CI also reported that Hickson was in possession of a pill-pressing machine. Moreover, according to the CI, after he/she had brought bulk steroid powder to Hickson in the past, Hickson would use the pill press to turn the powder into steroid pills. Upon pressing the powder into steroid pills, the CI would collect the pills from Hickson and distribute the pills to consumers.

During follow-up investigation, HSI agents learned that, on or about October 18, 2013, Customs and Border Protection officers conducted a routine border inspection of a parcel mailed from China to Hickson's residence in Aurora. During the inspection and resulting border search, CBP located and seized from the parcel approximately 436 grams of powder *Stanozolol*, a steroid that is a Schedule III controlled substance. A seizure notice was sent to Hickson in 2013. After conducting surveillance and trash pulls corroborating the CI's information, and after obtaining money transfer service records showing that Hickson transferred money to China during relevant timeframes, law enforcement obtained a state search warrant for Hickson's home.

*The Search of Hickson's Home*

The search of Hickson's home was executed on November 3, 2014. The search resulted in the discovery of a large drug laboratory and incriminating evidence. Among other things, agents recovered at least 10 kilograms of steroid powder, over 1,000 vials containing liquid

steroids, and hundreds of steroid pills and capsules. The CBP Laboratory tested representative amounts of the powders that were seized and confirmed that these were, in fact, types of Schedule III anabolic steroids, including over one kilogram of Testosterone Enanthate, over one kilogram of Nandrolone Decanoate, over one-half kilogram of Nandrolone Phenylpropionate, and over one kilogram of Testosterone 17b Cypionate.[1]

In addition, the search recovered drug manufacturing/distribution items, including a massive electronic pill press used for pressing steroid powder into tablets, numerous empty capsules, empty glass vials, shipping boxes, shipping labels, and several mail parcels addressed to individuals across the country. Also recovered from Hickson's fireplace were discarded items, such as a postal waybill for a parcel from China, which declared the contents as "titanium dioxide;" steroid vial labels with the name of Hickson's brand of steroids, "Rift Labs" and "truelab;" numerous Western Union and MoneyGram slips for fund transfers to China; and an October 13, 2014, email, in which the unknown sender, using a Safe-mail account, directs Hickson to use "batch 1012-1" to send steroids to various customers.[2]

---

[1] In the November 2016 Guidelines, 10 kilograms of bulk steroid powder, plus any quantity of liquid steroids and steroid pills/capsules that Hickson also had, far exceeds the 60,000 unit ceiling for a Schedule III substance other than Ketamine or Hydrocodone, as set forth in U.S.S.G. § 2D1.1(c)(10). Note (F) to the Drug Quantity Table provides, in relevant part, that "[f]or an anabolic steroid that is not in a pill, capsule, tablet, or liquid form… the court shall determine the base offense level using a reasonable estimate of the quantity of anabolic steroid involved in the offense. In making a reasonable estimate, the court shall consider that each 25 milligrams of an anabolic steroid is one 'unit.'" In this case, Hickson possessed at least 10 kilograms of powder anabolic steroids, which is the equivalent of 10,000,000 milligrams. Accordingly, 10,000,000 milligrams is the equivalent of 400,000 units.

[2] The unknown sender emphasized, "After you send the orders, please reply to this email and post tracking #'s below every order. TRACKING # IS A MUST. If you do not send me a tracking #, or tracking # does not work, I assume you did not send package. Please understand this: No tracking # = no package shipped and customers is refunded. PG = puregear vial truelab = truelab vial." Because the sender uses Safe-Mail, the sender could not be identified.

*Incriminating Admissions*

When confronted and interviewed, Hickson made inculpatory admissions, both orally and in a handwritten statement. Among other things, Hickson admitted that:

- He had been importing, manufacturing, and distributing anabolic steroids for approximately 15 months.[3] He acknowledged that what he was doing was illegal.

- He purchased the steroids from China and admitted to manufacturing and distributing at least 20 types of steroids, which he listed by scientific name.

- He wired thousands of dollars overseas to China to pay for the bulk steroid powder that he was smuggling into the United States. He estimated that he typically wired amounts ranging from $700 to $3,000.

- He received approximately 20 to 30 mail shipments of bulk steroid powder in the past 15 months.

- He used the Postal Service to ship steroids throughout the United States.

- He estimated that he had at least 100 customers across the nation. He said he was making and selling steroids under his own brand names, including True Labs, RiftLabs, and PureGear Labs. He would sell a bottle of liquid steroids for $40 to $50. He used Facebook and the internet to sell steroids. Most of his customers would contact him on FaceBook and then send him personal checks or cash.

- He collected approximately $100,000 as payment for the steroids that he sold.

- He used an upstairs bedroom, known as "the warehouse," as the area where he manufactured the steroids. He also stored supplies in the attic, where he kept between four to eight kilograms of bulk steroid powder.

- He acknowledged that all of the steroids in the home belonged to him, and he estimated he had approximately $60,000 worth of steroids inside the home. He said that his mother, who owned the home, was aware that he was using the home as a steroid lab.

*Follow-Up Investigation*

During the follow-up investigation, investigators also obtained the following:

---

[3] Although Hickson claimed that he began selling the drugs 15 months before the November 3, 2014, interview, or sometime in August 2013, Western Union records indicate that he began wiring funds to China in approximately April 2013.

- emails sent and received by Hickson, in which he discusses purchasing bulk steroid powder from China, sending money to China via Western Union and MoneyGram, cooking the powder steroids in his home laboratory, enlisting the help of others to manufacture the steroids, mailing the manufactured steroids to various locales in the United States; and receiving payments from steroid customers.

- Hickson's text messages to/from two younger associates, in which Hickson recruits the recipients to participate in his drug trafficking business.

- USPS Click n' Ship records, which reflect that Hickson opened the account on October 6, 2014, and sent 105 parcels across the country between that date and November 3, 2014. Hickson shipped 66 parcels, Individual B shipped 22 parcels, and Individual D shipped 17 parcels.

- Emails indicating that, after the search warrant was executed, Hickson contacted his suppliers abroad, warning them about the HSI investigation.

- Western Union records, which show that Hickson wired at least $24,565 overseas between April 2013 and June 2014, including at least $22,760 to China, listing his name and home address on the forms. During the same timeframe, Hickson received approximately $5,000 from individuals living across the country, in amounts ranging from $116 to $494. Among other things, for purposes of Count 3, the records indicate that, on or about April 17, 2014, Hickson transferred approximately $3,926 in funds from a Western Union office located in Aurora, to an individual residing in China, in order to purchase bulk steroid powder that Hickson had previously ordered online.

- MoneyGram records, which show that Hickson wired an additional $8,586 to China between July 2014 and August 2014.

*Cooperator/Witness Statements*

Based on the text messages, emails, and the Western Union records, agents identified three individuals that Hickson employed to help manufacture and/or distribute the steroids. Each admitted to assisting Hickson in drug-trafficking steroids.

Individual B was approximately 22-years-old when interviewed. In approximately August or September 2014, after he was Hickson's steroid customer for about two years, Hickson offered him the opportunity to make $20 per hour for unspecified work. He went to Hickson's home, and Hickson supplied plastic containers holding different powders, as well as empty capsules, and instructed him to fill the capsules with powder and then package them into

bottles. Hickson gave him $100 for this task. The next time, Individual B received $80 after he and a second individual, Individual C, filled capsules with powder. That day, Individual B also wired $2,500 to China at Hickson's direction, having received $20 to do so. At that time, Hickson claimed that he was "banned" from wiring money from the United States, and explained that the money Individual B wired was to be used to make steroids. Individual B admitted that, when he worked for Hickson, he knew that he was filling the capsules with steroid powder and that this was illegal.

Individual C, who was a 19-year-old high school student, reported the following. In approximately October 2014, Hickson asked if he would be willing to fill capsules with powder, in exchange for personal training sessions. He admitted to having gone to Hickson's home three times during a one week period to fill capsules of steroids. He acknowledged that Individual B was also present on one occasion and filled capsules. Later, after Hickson recruited him to sell steroids, Individual C tried to sell the drugs, but claimed he could not find customers.

Individual D, who was approximately 20-years-old when interviewed and recounted that, in the summer of 2014, Hickson informed him that he was a steroid distributor. After that, a friend asked Individual D if he knew anyone who sold steroids. Individual D then acted as a middleman between his friend and Hickson. Thereafter, by word of mouth, others asked Individual D about buying steroids from Hickson, and Individual D would direct them to Hickson, without expecting payment. As time passed, Individual D began to coordinate shipments to customers across the country, serving as a middleman between them and Hickson during a four to five-month period. Moreover, Individual D picked up steroids from Hickson and delivered them to others, and then brought Hickson the money, which Individual D estimated to be approximately $3,000. In exchange, Individual D received steroids.

*Hickson's Distribution to Others/Attempted Obstruction*

In summary, the documentary and other evidence reflects that, after manufacturing the anabolic steroids, Hickson used social media and the internet to sell and distribute drugs to more than 100 drug customers throughout the United States and Canada, and received at least $100,000 in drug proceeds.

Agents also interviewed Individual A. Individual A recounted that, on the night of the search, Hickson was worried that the police would seize funds from his bank accounts and asked her to liquidate them. She said that she declined to do what Hickson requested.

*Hickson's Attempted Cooperation/Subsequent Misconduct*

Hickson provided a proffer during which he described how he became involved in personally using steroids, but did not provided information that was deemed sufficient to warrant consideration for cooperation. Later, after being charged in this case, Hickson returned to possessing steroids. According to a Morton Grove police report, Hickson was arrested on or about May 21, 2016 -- several months after being charged in this case, but was found to be in possession of materials and anabolic steroids that suggest that he was still involved in the possession and possible distribution of these controlled substance. PSR, ¶66.

II.   **The PSR's Guidelines Calculations are Not Correct.**

The Government agrees with the PSR's guidelines estimates. The PSR concludes that defendant will fall at Level 23, after three-points are reduced for acceptance of responsibility, based on the following offense level calculations.

*Count One*

The PSR concludes that the base offense level is 20, pursuant to Guideline §§ 2D1.1(a)(5) and (c)(10), because the amount of mixtures and substances containing anabolic

steroids involved in the offense for which defendant is accountable is in excess of 10 kilograms, which is 60,000 or more units of Schedule III controlled substances. PSR, ¶¶32-34. The offense level is increased by 2 levels, pursuant to § 3B1.1(a), because defendant was an organizer or leader in any criminal activity. PSR, ¶41. Additionally, the PSR recognizes that the offense level is increased by 2 levels, pursuant to § 2D1.1(b)(15), because, in addition to being an organizer or leader in any criminal activity under § 3B1.1(a), defendant was directly involved in the importation of a controlled substance. PSR, ¶39. Based on the foregoing, the PSR concludes that total offense level for Count 1 is 24. *Id.*, ¶43.

### *Count 3*

With respect to the money laundering offense charged in Count 3, the PSR notes that, because defendant committed the underlying offense (conspiracy to possess with intent to distribute and distribute a controlled substance), and the offense level for that offense can be determined, the base offense level is 24, pursuant to § 2S1.1(a)(1). PSR, ¶44. Additionally, the PSR notes that, pursuant to § 2S1.1(b)(2)(B), the offense level is increased by 2 levels because defendant was convicted under 18 U.S.C. § 1956.

### *Grouping*

The PSR concludes that these offenses group, pursuant to § 3D1.3, so the offense level applicable to the group is the highest offense level related to the counts included in the group, *i.e.*, 26. PSR, ¶50.

### *Estimated Guidelines Calculation*

The calculations set forth in the PSR are correct. Defendant, who appears to be in Criminal History Category I, thus faces sentencing at Level 23, after three-levels are deducted

for acceptance of responsibility. PSR, ¶¶55, 63. The corresponding range is 46 to 57 months' imprisonment. *Id.*, ¶118.[4]

For the reasons set forth below, the Government urges the Court to sentence defendant within the applicable advisory Sentencing Guidelines range.

II.     **The Section 3553(a) Factors Warrant a Sentence Within the Sentencing Range.**

   A.   *The History and Characteristics of the Defendant*

With respect to his personal characteristics, defendant, now age 25, committed the offenses when he was younger, and he also has a limited criminal history that places him in Criminal History Category I. PSR, ¶63. He possesses no adult criminal convictions that affect his criminal history, *id.* at ¶61-62, and his two reported arrests at age 23 appear to be rooted in traffic matters.

What remains significant and troubling, however, is that defendant appears to have re-offended while on pretrial release in this case, in that he was arrested on or about May 21, 2016, after having been found in possession of Nandrolone and other suspicious items. *Id.*, ¶ 66. The resulting criminal case is a misdemeanor, but it is still pending. Nonetheless, this episode – which occurred after defendant was well-aware that he was charged with a federal crime – suggests that he may be hard-pressed to grasp the significance of this case and his convictions.

---

[4] The Government initially sought an additional enhancement under § 2D1.1(b)(7), because defendant used the internet to acquire raw steroid powder from Chinese suppliers, used Facebook and social media to communicate with his drug associates, and used email accounts to receive orders and update customers. The Government no longer seeks application of this enhancement. Similarly, although defendant clearly used his mother's home as the stash house for his drugs, as well as the laboratory where he manufactured raw powder into pills and liquid steroids, the Government does not seek a two-level enhancement, pursuant to § 2D1.1(b)(12), because this case appears to be distinguishable from *United States v. Flores-Olague*, 717 F.3d 526 (7th Cir. 2013). Finally, although there is some evidence that defendant sold his steroid products to high school students and also employed younger people in his drug manufacturing and distribution operation, the Government also does not now seek application of a two-level enhancement for vulnerable victims, pursuant to § 3A1.1(b)(1).

Notwithstanding the import of this additional offense and what it may say about defendant's appreciation for his current plight, it goes without saying that defendant's receipt of the instant felony convictions brings with it a substantial period of incarceration and other life-long consequences. He will also be subject to other significant punishments for his crime: a $100,000 money judgment and any additional fines that the Court may impose.

### B. *The Nature and Circumstances of the Offense/The Seriousness of the Offense*

The punishment to be imposed concerns defendant's involvement in possessing with intent to distribute Schedule III controlled substances, which defendant has admitted he imported from China for a period of over one year, and then manufactured into anabolic steroids in his home drug laboratory and sold to drug customers at a profit of approximately $100,000 by his own account. *Id*., ¶51. The nature and circumstances of the offense are significant, and the offense itself is serious.

Put simply, defendant, who grew up in a setting unlike many traditional drug dealers, chose consciously to ignore his upbringing, values, sense of propriety, and lawfulness, and instead embarked on a secret life of being a suburban drug dealer for a period of over one year, hurting himself and others physically by disseminating unregulated, untested anabolic steroid powders and liquids that he imported from foreign sources in China. For this crime, defendant is being held responsible for possessing with intent to distribute more than 10 kilograms of bulk steroid powder, plus any quantity of liquid steroids and steroid pills/capsules that he also had, which far exceed the 60,000 unit ceiling for a Schedule III substance set forth in U.S.S.G. 2D1.1(c)(10). These are not insignificant quantities of illegal narcotics. Congress' judgment that this drug offense should be punished by a term of imprisonment of up to 10 years, as well as the applicable advisory Sentencing Guidelines range of between 46 to 57 months' imprisonment

when the money laundering is also taken into account, further underscores the seriousness of defendant's offense.

To defendant's credit, after being confronted by federal agents, defendant acknowledged his wrongdoing and confessed his involvement in the charged offense, and he later tried to cooperate by participating in a proffer, though his efforts at receiving credit for cooperation were unsuccessful.

However, what cannot be ignored here is that defendant appears to have returned to some criminality by continuing to possess and possible distribute steroids while this case was pending. This poor choice, along with defendant's poor choice in discarding his otherwise conventional suburban upbringing and life, in favor of serious criminal conduct that carries a potentially significant period of incarceration, is the unfortunate result. Although this serious conduct is certainly not aberrant because it took place over an extended period, and also after he was notified by CBP of a seizure of a prior drug shipment, only defendant can explain *why* he undertook the risk of ruining the health of others, as well as the risk of serious imprisonment. *Why* the defendant became a large-scale steroid distributor cannot be explained, other than potential greed and a twisted sense of how to earn a living. And, why after being charged he would continue to engage in drug possession and also fail to appear in state court proceedings is even more troubling.

      C.    *The Need to Promote Respect for the Law, to Provide Just Punishment for the Offense, and to Afford Adequate Deterrence to Criminal Conduct*

Other factors which support a Guideline sentence for defendant are the need to promote respect for the law, provide just punishment for the offense, and afford adequate deterrence to criminal conduct. 18 U.S.C. § 3553(a)(2)(A), (2)(B). A low-end Guidelines sentence will also promote respect for the law by emphasizing to others the difficult consequences that follow from

11

involvement in such drug trafficking.

      **D.**    *The Need to Avoid Unwarranted Sentence Disparities*

The imposition of a sentence within the applicable range also will assist in ensuring the goals of fair and uniform sentencing. Congress' basic statutory goal in establishing the Sentencing Guidelines was to diminish excessive disparity and to achieve increased uniformity in sentencing. Although there no longer remains a presumption that a Guidelines sentence is the correct sentence, the Guidelines deserve serious consideration because they are "the product of careful study based upon extensive empirical evidence derived from the review of thousands of individual sentencing decisions." *Gall v. United States*, 522 U.S. 38, 46 (2007). A sentence linked to the Guidelines serves to minimize unwarranted sentencing disparities between this defendant and others similarly situated, including the many defendants who serve harsh punishment for trafficking in narcotics, but who were raised in much more difficult, hard-scrabble settings than defendant.

      **E.**    **Proposed Supervised Release Conditions**

Consistent with *United States v. Thompson*, 777 F.3d 368 (7th Cir. 2015), as well as the above-described Section 3553(a) factors, the Government also requests that the Court impose the supervised release conditions recommended in the PSR. PSR, ¶123.

**III.    Conclusion**

The Section 3553(a) factors counsel for a sentence within the applicable Guidelines sentencing range.  For this case, that range represents "a sentence sufficient, but not greater than necessary."  18 U.S.C.  3553(a).  Therefore, the United States requests that this Court sentence defendant Christopher C. Hickson to a sentence within the applicable advisory Guidelines sentencing range, to be followed by an appropriate period of supervised release.  Defendant should also be ordered to make immediate payment of a fine and his money judgment.

                              Respectfully submitted,

Dated: June 5, 2017         By:    */s/ Kartik K. Raman*
                                        KARTIK K. RAMAN
                                        Assistant United States Attorney
                                        219 S. Dearborn Street, Fifth Floor
                                        Chicago, Illinois  60604
                                        (312) 469-6026