IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 15 CR 529 |
| v. | ) | |
| | ) | Hon. Andrea R. Wood |
| CHRISTOPHER HICKSON | ) | |

### CHRISTOPHER HICKSON 'S SENTENCING MEMORANDUM

Defendant CHRISTOPHER HICKSON, by the Federal Defender Program and its attorney, MARY H. JUDGE, respectfully requests, pursuant to 18 U.S.C. §3553(a), *Gall v. United States*, 552 U.S. 38 (2007), and *Kimbrough v. United States*, 552 U. S. 85 (2007)), that this Honorable Court impose a sentence of probation coupled with a period of home confinement, because such a sentence is sufficient, but not greater than necessary, to comply with the purposes of sentencing set forth in 18 U.S.C. §3553(a). In support, Mr. Hickson states as follows:

**I.      The Advisory Guidelines Calculation**

The parties and the probation officer are now in agreement that the advisory guideline range is 46 to 57 months' imprisonment, based on an adjusted offense level 23 and a criminal history category I. Mr. Hickson is asking the Court to impose a below guideline sentence of five years' probation with a one year period of home confinement.

**Background**

Mr. Hickson was born and raised in Aurora, Illinois. He is currently 25 years old. He graduated from high school in 2010 and sporadically attended classes at a nearby Community College. Although his teachers identified symptoms of Attention Deficit Hyperactivity Disorder at a young age, he was not diagnosed or treated until recently. (PSI at 14). His difficulty in college was likely exacerbated by his untreated ADHD.

Mr. Hickson works as a personal trainer and the majority of his past work experience revolves around fitness (in addition to side jobs in restaurants, when financially necessary). Mr. Hickson's interest in power lifting was sparked at a very young age, and as a result of a tragic event. When he was seven years old, his father, a college professor, passed away suddenly from cancer. Obviously, this loss had many implications on his young life. Mr. Hickson became noticeably withdrawn following his father's sudden death. According to his mother, it was at this time that her son began power lifting. According to Mr. Hickson's truthful statement to agents at the time of his arrest, he began using legal performance anabolics at age 11. At the age of 13, he was ordering legal, but more potent anabolics, which he purchased from online retail stores. At the age of 14, and consistent with most, if not all serious power lifters, he began using various steroids, including by injection. He stopped using for about two to three years while on a school sports team, but started up again soon after graduating from high school. Eventually instead of purchasing steroids, he began ordering the ingredients on line and making them himself.

2

Mr. Hickson was not a sophisticated drug manufacturer or dealer. He openly ordered ingredients from China and had them delivered in his name to his home address. He freely interacted on Facebook with power lifters looking for steroids and had open discussions online about steroids. His customers sent him checks which he deposited into his account and/or endorsed and cashed. When agents arrived at his home he made a full statement about his steroid use and production. (The government relies significantly on this statement, see Government's position paper at 4).

Additionally, Mr. Hickson attempted to cooperate by providing the government with a complete and truthful proffer statement. Importantly, Mr. Hickson has stopped using steroids, is no longer a competitive power lifter, and he has been employed throughout the duration of his pretrial release.

## II.     Legal Standard

As this Court is well aware, after *Booker*, the United States Sentencing Guidelines are merely "advisory," and sentencing courts are required to consider all of the factors listed in 18 U.S.C. § 3553(a) when imposing sentence. *United States v. Booker*, 543 U.S. 220, 245 (2005). After considering the factors, the Court must "impose a sentence sufficient, *but not greater than necessary*, to comply with" the purposes of sentencing. 18 U.S.C. § 3553(a) (emphasis added). This parsimony provision serves as the "overarching" command of the statute. *See Kimbrough*, 552 U. S. at 100, 111. In imposing sentence, the Court must consider all of the §3553(a) factors to determine whether they support the

3

sentence requested by a party. [The Court] must make an individualized assessment based on the facts presented. *Gall*, 552 U. S. at 49-50.

The severity of mandatory minimums and the advisory sentencing guidelines in drug cases has now become part of the national dialogue. Such a dialogue is necessary and a long time coming. Although Mr. Hickson is not subject to a mandatory minimum, because his guideline range is based in significant part on drug type and quantity, it is important that the Court craft a sentence based not only on the guideline range, but on the individual before the Court with that person's unique characteristics in mind. The post-*Booker* courts are required to consider the Guidelines ranges, "but it permits the court to tailor the sentence in light of other statutory concerns as well . . . "*Booker*, 125 S. Ct. at 756-57. Notably, the Guidelines are not to be afforded heavy weight relative to other sentencing factors. "Courts are free to disagree, in individual cases and in the exercise of discretion, with the actual range proposed by the guidelines, so long as the ultimate sentence is reasonable and carefully supported by reasons tied to the Section 3553(a) factors." *United States v. Ranum* 353 F.Supp.2d 984, 987-89 (E.D. Wis. 2005).

III.  SECTION 3553(a) FACTORS

  A.  **The nature and circumstances of the offense and the history and characteristics of the defendant.**

There is no question that drug distribution and money laundering are very serious crimes. Drugs cause serious problems in our society and have brought great pain to many individuals and entire communities.

Notably, Mr. Hickson made a full admission at the time of his arrest and he spoke openly about his steroid use and the origins of this offense. He advised that he began working out shortly after his father's death and power lifting became his passion. All of his free time was spent at the gym and all of his friends were other power lifters. Everyone he knew openly discussed what enhancements they used and where they got them. Competitive powerlifters were not disqualified for using illegal steroids, and most competitors freely admitted using. Mr. Hickson explained that steroids were expensive, so eventually he began purchasing the raw materials and manufacturing the steroids himself. He learned that by making his own steroids, he could better control the dosing and thereby tailor the performance and safety of the drug. Mr. Hickson's steroid production began without any plan to distribute drugs to others and at first it was just him using the steroids that he made. Through word of mouth and on Facebook, Mr. Hickson began selling steroids to like-minded persons from the gym and the powerlifting community.

There is no easy explanation for how an otherwise law abiding (very) young man (the offense took place beginning in April 2013 until November 3, 2014; during this time Mr. Hickson was 20 to 22 years-old) could get so involved in the manufacture and distribution of illegal drugs. But part of the explanation certainly lies in the fact that there is a level of steroid acceptance in the weight lifting community. Mr. Hickson's approach to the manufacture and sale of steroids was done with a certain naivete about

5

the ill effects. He got caught up in the body building world at a young and impressionable age, saw numerous examples around him of individuals using and sharing steroids, and got involved in the manufacturing and distribution of steroids himself without thinking deeply about the fact that steroids are a dangerous and illegal drug.

Importantly, since his arrest, Mr. Hickson has stopped using and manufacturing steroids. Admittedly, Mr. Hickson was charged in the state after a traffic stop and was suspected of having steroid paraphernalia in his car. (PSI at 12). The warrant is no longer outstanding and Mr. Hickson has since received a sentence of 20 hours of community service for the violation. Additionally, during the PSI interview, Mr. Hickson admitted to using recreational drugs (cocaine and marijuana sporadically) because he was scared and depressed about being sent to prison. This admission is demonstrative of extremely poor judgment, but also honesty, and is not indicative of an underlying substance abuse issue. Once probation learned that he was using drugs recreationally, he began being supervised by pretrial services, including drug testing. Mr. Hickson has not had any positive test results to date according to Pretrial Services.

Both the offense conduct and Mr. Hickson's history and characteristics support the imposition of a sentence of probation. Mr. Hickson was very young at the time of the offense. He was 20 years old when he started selling and manufacturing steroids after getting caught up in the world of power lifting. Mr. Hickson is a non-violent, youthful, first time offender who does not have a substance abuse issue and does not suffer from

mental illness. Mr. Hickson can continue to reside at his mother's home in Aurora. His participation in criminal activity was entirely a result of his being immersed in the world of competitive power lifting events. Because he is no longer involved in that his risk of recidivism and the need for retribution is significantly reduced.

    **B.    A sentence of probation with a period of home confinement, reflects the seriousness of the offense, promotes respect for the law and provides just punishment.**

While making its determination of what is a fair and just punishment for the crime committed, a sentencing court should take a holistic approach during its assessment; taking into consideration the collateral hardships that the defendant will face in addition to the sentence itself. As a result of his plea, Mr. Hickson will be a convicted felon – for drug trafficking and money laundering – and will thus face many collateral consequences that will have a lasting effect on his life, not the least of which is difficulty finding and maintaining employment. In addition, he will forfeit significant civil rights, including, but not limited to, the right to vote, serve on a jury and hold public office.

It is also important to consider the negative consequences of the imposition of a sentence that is greater than necessary. *See United States v. Bannister,* 786 F. Supp. 2d 617, 659 (E.D.N.Y. 2011) "Recidivism may be promoted by the behavior traits prisoners develop while incarcerated".

7

Furthermore, non-custodial sentencing has proven to be effective in reducing the risk of recidivism in cases such as Mr. Hickson's. *See id.* At 656 (explaining that "non-incarceratory methods of rehabilitation can be used and improved to minimize the risk of recidivism. Systems of probation, parole, and supervised release have proven to be effective when violations are met with swift, consistent, and predictable negative consequences.") (citing Mark A.R. Kleiman, *Smarter Punishment, Less Crime,* Am. Prospect, Jan.-Feb. 2011, at A5). And, as the Supreme Court concluded in *Gall,* 552 U.S. at 44, "probation, rather than 'an act of leniency,' is a 'substantial restriction of punishment." Especially if coupled with home detention. Based on Mr. Hickson's lack of any prior criminal history and the fact that he has quit power lifting, the activity that drove him to steroids in the first place, a non-custodial sentence would adequately promote the goals of sentencing.

### C. The need to provide adequate medical care in the most effective manner.

Mr. Hickson, as previously mentioned, has no mental health or substance abuse issues, and requires no treatment for such. He does, however, have a medical issue regarding his knee. Mr. Hickson has had three knee surgeries since his arrest. The first was thought to be the last, but two unplanned surgeries were required thereafter. Further complicating matters, Mr. Hickson has been on antibiotic medication off and on for a chronic infection that has plagued his knee recovery since the surgery. The most effective manner in which to treat Mr. Hickson's medical conditions, including his knee rehabilitation and infection, is to allow Mr. Hickson to continue working with the

8

hospital, surgeons and doctors currently helping him with his recovery. Not surprisingly, this severe injury has taught Mr. Hickson to take much better care of his body, which is what propelled him to become a personal trainer and has convinced him that power lifting and using enhancements are something he will never take part in again.

V.	**Conclusion**

Christopher Hickson understands the seriousness of the crime that he committed and he sincerely regrets the terrible judgment he used in allowing himself to become involved in this offense. A sentence of five years' probation, with one year on home confinement, based on the unlikelihood of recidivism upon his release, is sufficient but not greater than necessary to meet the goals of sentencing as articulated in §3553(a).

Respectfully submitted,

FEDERAL DEFENDER PROGRAM
Carol A. Brook
Executive Director

By: s/*Mary H. Judge*
	Mary H. Judge

FEDERAL DEFENDER PROGRAM
55 E. Monroe Street, Suite 2800
Chicago, IL   60603
(312) 621-2034

## CERTIFICATE OF SERVICE

The undersigned, <u>Mary H. Judge</u>, an attorney with the Federal Defender Program hereby certifies that in accordance with FED.R.CRIM. P. 49, FED. R. CIV. P5, LR5.5, and the General Order on Electronic Case Filing (ECF), the following document(s):

## CHRISTOPHER HICKSON'S SENTENCING MEMORANDUM

was served pursuant to the district courts ECF system as to ECF filings, if any, and were sent by first-class mail/hand delivery on <u>October 10, 2017</u>, to counsel/parties that are non-ECF filers.

          By:    s/*Mary H. Judge*
                  MARY H. JUDGE
                  FEDERAL DEFENDER PROGRAM
                  55 E. Monroe St., Suite 2800
                  Chicago, Illinois 60603
                  (312) 621-2034